**O**

# United States District Court
# Central District of California

| | |
|---|---|
| MELISSA HENSON and KEITH TURNER on behalf of themselves and others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>FIDELITY NATIONAL FINANCIAL INC.,<br><br>                    Defendant. | Case No. 2:14-cv-01240-ODW(RZx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT FIDELITY NATIONAL FINANCIAL INC.'S MOTION TO DISMISS [19]** |

## I.    INTRODUCTION

The Real Estate Settlement Procedures Act ("RESPA") prohibits kickbacks and splits of unearned fees in connection with referring real-estate settlement business involving a federally related mortgage loan.  12 U.S.C. § 2607.  Plaintiffs Melissa Henson and Keith Turner contend that Defendant Fidelity National Financial violated RESPA when it received "marketing" fees from UPS, Federal Express, and OnTrac in exchange for referring overnight delivery business to the carriers via Fidelity's escrow subsidiaries.

To establish that her claims are timely, Henson attempts to rely on tolling under the Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S.

1    538 (1974).  But the Court finds that a former putative class member may not rely on
2    *American Pipe* tolling for the period commencing after a trial court dismisses the
3    previous putative class action.  RESPA's one-year statute of limitations therefore bars
4    Henson's claims.  Since Plaintiffs have alleged that Fidelity performed actual services
5    for its marketing fees, Turner also cannot establish any prohibited fee splitting as a
6    matter of law under § 2607(b).  The Court accordingly **GRANTS IN PART** and
7    **DENIES IN PART** Fidelity's Motion to Dismiss.[1]

## II.  FACTUAL BACKGROUND

9        Fidelity is the controlling parent of various escrow subsidiaries.  (Compl. ¶ 13.)
10   These escrow subsidiaries use UPS, Federal Express, and OnTrac (the "Delivery
11   Companies") to handle overnight deliveries in connection with processing and closing
12   federally related mortgage loans.  (*Id.*)  The subsidiaries charge escrow customers for
13   these delivery services during closing of real-estate transactions.  (*Id.*)

14       Plaintiffs allege that Fidelity had separate, written "master" agreements with
15   each of the Delivery Companies by which Fidelity—through a subsidiary called EC
16   Purchasing—accepted a split of the charges received by the carriers and kickbacks in
17   exchange for referring delivery services to the companies.  (*Id.* ¶ 14; Mizes Decl.
18   ¶ 11.)  Fidelity characterizes these payments as "marketing" fees from the Delivery
19   Companies, which it receives in relation to the volume of business that Fidelity and its
20   escrow subsidiaries transact with the carriers.  (Compl. ¶ 15; Mizes Decl. ¶ 12.)
21   Fidelity's compliance department has repeatedly instructed its escrow subsidiaries to
22   use the Delivery Companies for overnight delivery services.  (Compl. ¶ 17.)  But
23   Plaintiffs contend that Fidelity exercises such control over the subsidiaries that they
24   did not need "marketing" services to ensure that they complied with the master
25   agreements.  (*Id.* ¶ 18.)

26   / / /

---

[1] After carefully considering the papers filed with respect to this Motion, the Court deems the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; L.R. 7-15.

On February 15, 2012, Henson closed escrow on a house in Bakersfield, California.  (*Id.* ¶¶ 4, 22.)  The purchase involved a federally related mortgage loan.  (*Id.* ¶ 22.)  Chicago Title Company, a Fidelity subsidiary, handled escrow for the transaction.  (*Id.* ¶ 23.)  Chicago Title's "Buyer's Final Closing Statement" included a $13.81 charge for "Overnight Delivery Fee," which Henson paid.  (*Id.*)

On September 11, 2012, Turner refinanced his house in Los Angeles, California, with a federally related mortgage loan.  (*Id.* ¶ 24.)  Lawyers Title, another Fidelity subsidiary, handled the escrow.  (*Id.*)  Lawyers Title's "Final Settlement Statement (HUD-1)" included a $19.98 charge for overnight deliveries through Federal Express and OnTrac.

Plaintiffs allege that the amount the escrow subsidiaries charged Henson and Turner for overnight deliveries exceeded the net amount actually received by the Delivery Companies for the services they rendered.  (*Id.* ¶ 25.)

Plaintiffs further contend that they had no reason to know of Fidelity's alleged kickbacks and fee splits, because Fidelity omitted the Delivery Companies' payments from the itemized closing statements.  (*Id.* ¶ 26.)  The master agreements also contained confidentiality provisions and were filed under seal in a related case.  (*Id.* ¶ 27.)

On June 12, 2012, Penelope Bergman filed a putative class-action complaint against Fidelity in Los Angeles County Superior Court, alleging that Fidelity violated RESPA through overnight-delivery charges.  *Bergman v. Fidelity Nat'l Fin., Inc.*, No. BC486460 (L.A. Cnty. Super. Ct. filed Jun. 12, 2012).  It is undisputed that Henson and Turner were members of the putative class Bergman sought to represent.  Fidelity thereafter removed the action to this Court.  No. 2:12-cv-05994-ODW(RZx).  On December 3, 2012, the Court granted Fidelity's converted summary-judgment motion, finding that Bergman's loan was primarily commercial in nature and therefore did not fall within RESPA's ambit.  The Court accordingly entered judgment in favor

/ / /

of Fidelity.  Bergman appeal.  But on August 30, 2013, the Ninth Circuit Court of Appeals granted the parties' stipulation to dismiss the appeal.

On September 9, 2013, Henson and Turner filed this putative class action against Fidelity, alleging that Fidelity received kickbacks and fee splits in violation of RESPA.  (ECF No. 1.)  Fidelity subsequently moved to dismiss the Complaint for failure to state a claim.  Plaintiffs timely opposed.  That Motion is now before the Court for decision.

### III.   LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim.  *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003).  The factual "allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff.  *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).  But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

/ / /

/ / /

# IV.   DISCUSSION

Fidelity argues that Henson may not rely on *American Pipe* tolling for the period after the Court dismissed Bergman's putative class action—and therefore RESPA's one-year statute of limitation bars Henson's claims.  It also contends that Plaintiffs have failed to properly allege a kickback or fee split in violation in § 2607(b).  The Court agrees that Henson's claims are time-barred and that Plaintiffs' fee-splitting allegation fails as a matter of law.

## A.   Statute of limitations

While Henson filed suit over one year after escrow closed on her home purchase, she contends that either *American Pipe* or equitable tolling applies, thus rendering her claims timely.  The Court disagrees.

### 1.   American Pipe *tolling*

RESPA provides that a plaintiff must commence any action for alleged violations of, among others, § 2607 within one year "from the date of the occurrence of the violation."  12 U.S.C. § 2614.

Fidelity does not dispute that Turner's claims are timely.  Rather, Fidelity only asserts that RESPA's statute of limitations bars Henson's claims.  Fidelity argues that even if the *Bergman* case tolled the statute of limitations with respect to Henson's claims, Henson still surpassed the limitations period by 63 days.  Fidelity contends that December 3, 2012—the date the Court granted Fidelity's converted summary-judgment motion in *Bergman*—is the date that the statute began to run again for putative class members such as Henson.  Since escrow on Henson's Bakersfield house closed on February 15, 2012, and Bergman filed suit on July 12, 2012, a period of 148 days passed before *Bergman* tolled the statute of limitations.   Counting from December 3, 2012, to September 9, 2013, Henson waited another 280 days to file suit against Fidelity—63 days over the 365-day statute of limitations.

But Fidelity also argues that the Court dismissed Bergman's action because she lacked standing to pursue RESPA claims on behalf of the putative class.  Fidelity

1   therefore contends that Plaintiffs may not rely on the *Bergman* action to toll the statute
2   of limitations under *American Pipe*.

3       Plaintiffs disagree, asserting that *Bergman* tolled the statute of limitations for
4   the putative class's claims regardless of why the Court dismissed the action.  Plaintiffs
5   also note that the Court specifically found in an earlier Order that Bergman had
6   standing to pursue her RESPA claims; the Court only granted summary judgment for
7   Fidelity because her loan was primarily commercial in nature.  Citing to *Burnett v.*
8   *New York Central Railroad Co.*, 380 U.S. 424 (1965), Plaintiffs argue that the
9   *Bergman* action tolled the statute of limitations through the pendency of the appeal,
10  that is, until August 30, 2013.  They contend that "it makes more sense to encourage
11  putative class members to rely on the class action while an appeal is pending, and to
12  re-file only upon learning that the appeal was dropped, dismissed, or otherwise
13  resolved on grounds that are not binding on the class."  (Opp'n 19.)

14      In *American Pipe*, the Supreme Court held that the commencement of a class
15  action tolls the statute of limitations until a motion "strip[s] the suit of its class action
16  character."  414 U.S. at 561.  The Court later extended this holding, concluding that
17  once "the statute of limitations has been tolled, it remains tolled for all members of the
18  putative class *until class certification is denied*.  At that point, class members may
19  choose to file their own suits or to intervene as plaintiffs in the pending action."
20  *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 354 (1983) (emphasis added).

21      In both cases, the Supreme Court referred to class-certification denial as the
22  point at which putative class members could no longer rely on tolling; neither case
23  references the effect an appeal has on tolling the limitations period.  In fact, when the
24  Court addressed the inefficiencies that would result from not allowing tolling for all
25  putative class members regardless of whether they tried to intervene, the Court
26  specifically referred to wanting to prevent "a needless multiplicity of actions" prior to
27  a "denial of class certification."  *Id.* at 350–51.  After that point, a class member may
28  / / /

either move to intervene in the pending lawsuit—now stripped of its class-action character—or file her own action.  *Id.* at 354.

The Supreme Court also anticipated that former putative class members would file their own actions upon denial of class certification—thus setting that period as the end of the tolling period.  The Court held that tolling during the pre-certification period "creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification."  *Id.* at 353.

Another Central District of California judge has had several occasions to visit the issue of whether *American Pipe* tolling applies beyond trial-court dismissal. Citing to Supreme Court's language and considerations, Judge Pfaelzer concluded that "*American Pipe* tolling ends when the trial court issues a decision that strips the action of its status as a putative class action."  *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2:11-ML-02265-MRP, 2012 WL 1097244, at *4 (C.D. Cal. Mar. 9, 2012); *accord Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1380 (11th Cir. 1998) (holding that once the trial court denies class certification, "the excluded putative class members are put on notice that they must act independently to protect their rights").

Henson's reliance on *Burnett* is misplaced.  In that case, the Supreme Court held that the statute of limitations is tolled during the pendency of a state action preceding a federal one "until the state court order dismissing the state action becomes final by the running of the time during which an appeal may be taken or the entry of a final judgment on appeal."  380 U.S. at 435.  But the Court only considered whether a particular plaintiff's action was tolled when he originally timely brought suit in state court but thereafter filed an untimely federal action.  *Id.* at 424–25.  There was no class action at issue—and thus no putative class members watching the litigation to determine whether they should intervene to protect their legal rights.  Rather, the Supreme Court only found that the interests of justice permitted tolling of a particular plaintiff's claims when he timely filed a state-court action that was ultimately dismissed for improper venue.  *Id.* at 434–35.

1       The Supreme Court's decision in *United Airlines, Inc. v. McDonald*, 432 U.S.

2  385 (1977), similarly does not compel a different result.  In that case, a former

3  putative class member sought to intervene in an action after the trial court entered

4  final judgment against the named plaintiffs and the named plaintiffs chose not to

5  pursue an appeal.  *Id.* at 390.  The putative class member sought to intervene so that

6  she could challenge the trial court's class-certification denial.  *Id.*  Distinguishing

7  *American Pipe*, the Supreme Court found that the statute of limitations did not begin

8  to run after the trial court's denial of class certification; rather, the limitations period

9  continued to be tolled when the former putative class member sought to intervene.  *Id.*

10  at 394–95.

11       But Henson never attempted to intervene in the *Bergman* action.  This point is

12  crucial, as the Supreme Court specifically concluded that the "critical fact" in *United*

13  *Airlines* was that the individual promptly moved to intervene to protect unnamed class

14  members' interests after the named plaintiffs chose not to pursue an appeal.  *Id.*

15  at 394.  The Supreme Court thus only extended *American Pipe* tolling through the

16  pendency of an appeal if a putative class member herself attempted to intervene and

17  take over the reins of the appeal—a situation simply not present in this case.

18       Considering the explicit language used the Supreme Court, the Court finds that

19  a putative class action only tolls the statute of limitations for putative class members

20  until the trial court denies class certification, dismisses the lawsuit, or otherwise strips

21  the action of its putative-class-action status.  At that point, a former putative class

22  member must either move to intervene in the pending litigation or file her own action

23  to preserve her claims.  The pendency of the appeal—without more—does not affect

24  the statute of limitations with respect to putative class members.  The *Bergman* action

25  thus only tolled the statute of limitation on Henson's RESPA claims until December

26  3, 2012—thus rendering her current claims untimely by 63 days.  Since Turner's

27  claims are timely regardless of tolling, the Court need not address the issue of whether

28  Bergman lacked standing in the previous putative class action.

2.      *Equitable tolling*[2]

Equitable tolling allows a plaintiff to prevent the statute of limitations from running during a particular period if he can establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).  The focus is on the plaintiff and whether he acted diligently in pursuing his claims; the effect of the defendant's conduct is a separate issue.  *See Naton v. Bank of Cal.*, 649 F.2d 691, 696 (9th Cir. 1981).

Henson argues that the Court should apply equitable tolling because she had no reason to know of facts constituting Fidelity's alleged RESPA violations.  She contends that Fidelity kept its master agreements with the Delivery Companies confidential, thus preventing her from discovering them.  But Fidelity asserts that Henson was aware of the line-item charge for overnight delivery services as reflected on her settlement statement.

While Henson argues much about what Fidelity did or did not do with respect to informing her about the master agreements, she focuses little on establishing her own diligence in pursuing her claims.  It is undisputed that the overnight delivery fee appeared on her real-estate settlement documents.  (Compl. ¶ 23.)  Apparently Henson only received a copy of this document "long after the closing." (*Id.*)  But it is difficult to paint Henson's action as diligent when she admittedly purchased a house without ever reading the final settlement statement.  Had she read this document at closing, she would have seen the overnight delivery charge and been on notice of the fee.

And even if Fidelity and the Delivery Companies' actions could factor into the equitable-tolling inquiry, it would not have made a difference in Henson's situation. / / /

---

[2] Fidelity preemptively argues in its Motion why Henson cannot rely on the related doctrines equitable estoppel and the delayed-discovery rule.  But since Henson does not argue in her Opposition that either apply—and likely for good reason—the Court finds that those doctrines do not save her RESPA claims either.

1    The master agreements would have meant little to Henson without her first reading the

2    settlement statement and understanding that she paid for overnight delivery services.

3      The Court thus finds that RESPA's statute of limitations bars Henson's claims

4    and accordingly **GRANTS** Fidelity's Motion with respect to Henson only.

5    **B. 12 U.S.C. § 2607(a)**

6      Congress enacted RESPA "to insure that consumers throughout the Nation are

7    provided with greater and more timely information on the nature and costs of the

8    settlement process and are protected from unnecessarily high settlement charges

9    caused by certain abusive practices that have developed in some areas of the country."

10   12 U.S.C. § 2601(a).  The Act prohibits two acts: giving or accepting a kickback for

11   referring "business incident to or a part of a real estate settlement service," and

12   splitting a charge incurred as the result of a real-estate settlement service apart from

13   services actually performed.  § 2607(a), (b).  Plaintiffs allege that Fidelity violated

14   both provisions.

15     *3. Settlement service*

16     Section 2607(a) provides that no "person shall give and no person shall accept

17   any fee, kickback, or thing of value pursuant to any agreement or understanding, oral

18   or otherwise, that business incident to or a part of a real estate settlement service

19   involving a federally related mortgage loan shall be referred to any person."  Congress

20   defined "settlement services" as "any service provided in connection with a real estate

21   settlement."  12 U.S.C. § 2602(3).  Congress also set forth a nonexhaustive list of

22   services subject to RESPA, including document preparation and the handling and

23   processing of a closing.  *Id.*

24     Fidelity argues that § 2602(3)'s definition of "settlement services" demonstrates

25   that RESPA governs only those services within the real-estate and conveyancing

26   industries, such as title insurers, lenders, escrow companies, and realtors.  Fidelity

27   contends that it would "produce absurd results" to subject companies like Kinko's and

28   Staples to RESPA regulation for tangential services they might provide in real-estate

settlements.  The Delivery Companies have also not been historically of state and local concern for regulation, as they are not part of the real-estate and conveyancing industries.

But Plaintiffs assert that RESPA's plain language and accompanying regulations include delivery services within RESPA's reach.  They also point out that there "is no absurdity in concluding that RESPA contains no loophole for kickbacks for the referral of delivery services or any other service.  Its purpose is to protect consumers."  (Opp'n 4.)

The Court finds that Plaintiffs adequately pleaded that the overnight delivery services provided by the Delivery Companies are "settlement services" within RESPA's ambit.  Regulation X specifically mentions "delivery" as a settlement service.  24 C.F.R. § 3500.2(6).  There is also no serious dispute that the overnight delivery services were "provided in connection with a real estate settlement," namely, Henson and Turner's closings.  *See* 12 U.S.C. § 2602(3).  Had there been no real-estate settlements, there would have been no need to employ the Delivery Companies' services.  It is curious that Fidelity spends pages arguing that "delivery" somehow does not mean the delivery of documents involved in this case.  The Court declines to ignore the plain language of the statute and regulations—as well as their common-sense application to real-estate settlements—to find that the word "delivery" could not possibly apply to overnight delivery services.

Neither would it be "absurd" to subject companies like the Delivery Companies, Staples, and Kinko's to RESPA regulation.  Congress has not exempted delivery and office-supply companies from the prohibition against kickbacks and unearned-fee splitting.  It is therefore not up to the courts to engraft such an exception onto the statute.  As long as those companies do not give or accept money in exchange for referring real-estate settlement business or split unearned fees, they will not run afoul of RESPA.  The Court consequently **DENIES** Fidelity's Motion on this ground.

/ / /

### 4.    Referral

A necessary element of a § 2607(a) violation is a referral of "business incident to or part of a settlement service" in exchange for "any fee, kickback, or thing of value." *See* § 2607(a). The Regulations provide that a referral may be "any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service or business incident to or part of a settlement service" or when a person is "required to use" a particular settlement-service provider. 24 C.F.R. § 3500.14(f).

Fidelity argues that Plaintiffs never allege an actual referral or that Fidelity affirmatively influenced them to select the Delivery Companies in connection with their closings. Fidelity also contends that Plaintiffs were not "required to use" the Delivery Companies in lieu of other carriers as a condition of Chicago Title Company or Lawyers' Title handling their escrow transactions.

Plaintiffs in turn argue that they alleged a referral by which Fidelity receives a "marketing" fee based on the volume of business referred to the Delivery Companies. They also point out that under the Supreme Court's recent decision in *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034 (2012), a prohibited referral agreement need not be connected to a particular transaction to violate § 2607(a)—such as the marketing fees the Delivery Companies pay Fidelity on a periodic basis. Further, Henson and Turner aver that Fidelity established a referral arrangement by entering into the master agreement and issuing internal compliance memoranda that required its escrow subsidiaries to utilize the Delivery Companies for courier services.

The Court agrees with Henson and Turner that they have adequately alleged a referral. Plaintiffs allege that the Delivery Companies paid Fidelity a "marketing" fee based on the volume of business that Fidelity's subsidiaries referred to the carriers. (Compl. ¶ 25.) Under the Regulations, when "a thing of value is received repeatedly *and is connected in any way with the volume or value of the business referred*, the receipt of the thing of value is evidence that it is made pursuant to an agreement or

understanding for the referral of business." 24 C.F.R. § 3500.14(e) (emphasis added). Plaintiffs are also correct that the prohibited referral agreement need not be linked to each particular real-estate settlement; it is enough that the relationship exists and that forbidden payments are made. *Freeman*, 132 S. Ct. at 2043.

Finally, § 2607(a)'s plain text belies Fidelity's argument that "RESPA requires an affirmative influence of Plaintiffs—not escrow companies." (Reply 5 (emphasis omitted).) Section 2607(a) provides that "[n]o person shall give and no person shall accept" a kickback in exchange for referring real-estate settlement business. § 2607(a). The statute is not limited to just certain entities, nor is there is a textual requirement that the referral directly involve the purchaser-plaintiff. Rather, RESPA envelopes any person that engages in the proscribed acts. The Court therefore **DENIES** Fidelity's Motion on this ground.

## C.     12 U.S.C. § 2607(b)

Section 2607(b) provides that no "person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b). Fidelity contends that Plaintiffs failed to adequately plead either a split of an unearned fee or that Fidelity did not perform any services in exchange for the "marketing" fees it allegedly received.

### 1.     *Split*

The Supreme Court recently interpreted what constitutes a "split" for § 2607(b) purposes. The Court held that in order to establish a violation of that section, "a plaintiff must demonstrate that a charge for settlement services was divided between two or more persons." *Freeman*, 132 S. Ct. at 2044.

Fidelity argues that Henson and Turner failed to allege that the $13.71 and $19.98 line items on their HUD-1 settlement statements were divided between two or more persons at the time of the closing. Fidelity asserts that it would be "absurd" to

1    extend RESPA to cover payments made by a payee with multiple sources of revenue
2    long after closing.

3           But Plaintiffs point out that § 2607(b) includes no time limitation within which
4    the split must occur.  They contend that the split transpired when the Delivery
5    Companies paid Fidelity a marketing fee based on the volume of business Fidelity and
6    its escrow subsidiaries referred—as Plaintiffs wrote, "[m]ore business, more
7    kickback."  (Opp'n 9.)

8           The Court finds that Henson and Turner complied with the Supreme Court's
9    elucidation of the "split" requirement in *Freeman*.  They alleged that the Delivery
10   Companies provided Fidelity with marketing fees via EC Purchasing, that is, a
11   division "between two or more persons."  132 S. Ct. at 2044.

12          Plaintiffs are also correct that § 2607(b) contains no temporal limitation.  There
13   is no textual requirement that the split occur at or near the time of closing.  The split
14   must simply be "in connection with a transaction involving a federally related
15   mortgage loan"—even if that division happens at the end of the quarter or year.  *See*
16   § 2607(b).  That result is not "absurd" as Fidelity suggests; it is simply the effect of
17   RESPA's language as Congress enacted it.  Congress likely did not include a time
18   period within which the split must occur, because that would permit a person to avoid
19   § 2607(b) simply by splitting the unearned fee after the period elapsed.  That result
20   would be absurd—not the all-encompassing-liability result in this case.  The Court
21   therefore **DENIES** Fidelity's Motion on this ground.

22          2.    *Actual services*

23          The Regulations provide that a "charge by a person for which no or nominal
24   services are performed or for which duplicative fees are charged is an unearned fee
25   and violates [§ 2607(b)]."  24 C.F.R. § 3500.14(c).  The corollary of that rule is that
26   no prohibited split can occur for RESPA purposes if the person receiving the kickback
27   has performed actual services—no matter how little services she performs.  *See*
28   § 2607(b).

1    Fidelity contends that Plaintiffs admitted that Fidelity performed actual services
2    in exchange for its marketing fee, namely, promoting the overnight delivery
3    companies to its escrow subsidiaries.  Henson and Turner disagree, arguing that
4    Fidelity accepted a fee split "other than for services actually performed" because the
5    fee was for the referral, not the services.  They contend that "promoted" or "marketed"
6    are merely "euphemisms" for a referral.

7    Case law has foreclosed Plaintiffs' argument.  The Supreme Court specifically
8    held that because "§ 2607(b) manifestly cannot be understood to prohibit
9    unreasonably high fees, a service provider could avoid liability by providing just a
10   dollar's worth of services in exchange for the $1,000 fee." *Freeman*, 132 S. Ct. at
11   2044.  The amount of services Fidelity performed for the Delivery Companies is
12   therefore irrelevant; the key issue is whether it provided services at all.

13   Plaintiffs establish in their Complaint that Fidelity did in fact provide services
14   by promoting the Delivery Companies to its escrow subsidiaries via internal
15   compliance memoranda.  (*See, e.g.*, Compl. ¶¶ 15, 17.)  In fact, they specifically
16   attach a declaration from Steve Mizes, the president of EC Purchasing—a Fidelity
17   subsidiary.  (Mizes Decl. ¶ 2.)  Mizes states that for "some contracts with FedEx,
18   UPS, and OnTrac, EC Purchasing[3] has received a 'marketing fee' from the Vendor
19   *for EC Purchasing's services*.  Those fees are deposited with EC Purchasing *for EC*
20   *Purchasing's services*."  (*Id.* ¶ 11 (emphasis added).)  Plaintiffs own allegations
21   therefore belie their argument that Fidelity received a fee without performing any
22   actual services.

23   As the Supreme Court and Ninth Circuit have made clear, it is manifestly
24   irrelevant whether Fidelity received an "excessive" fee for its services.  *Freeman*, 132
25   S. Ct. at 2044; *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 553–54 (9th
26   Cir. 2010) ("[Section 2607(b)] cannot be read to prohibit charging fees, excessive or

---

3 Neither party disputes whether Fidelity is liable for the actions of its subsidiary EC Purchasing.
The Court therefore presumes at this stage that EC Purchasing's actions are imputed to Fidelity.

otherwise, when those fees are for services that were actually performed."). Plaintiffs thus cannot have it both ways; they cannot both allege that Fidelity received marketing fees and then contend that those fees are really chimerical. The Court must accordingly **GRANT** Fidelity's Motion on this ground. Since there is no way that Plaintiffs can now double back on their marketing-services allegation and still comply with Rule 11(b), the Court will not permit Henson and Turner to amend this portion of their Complaint.

## V.   CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** Fidelity's Motion to Dismiss with respect to all of Henson's claims and Plaintiffs' § 2607(b) claim and **DENIES IN PART** the Motion on all other grounds. (ECF No. 19.) Since the Court will not permit Plaintiffs to amend their § 2607(b) claim, Fidelity shall file its answer within 14 days.

**IT IS SO ORDERED.**

March 21, 2014

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

16