O

# United States District Court
# Central District of California

| | |
|---|---|
| MELISSA HENSON and KEITH TURNER on behalf of themselves and others similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>FIDELITY NATIONAL FINANCIAL INC.,<br><br>      Defendant. | Case No. 2:14-cv-01240-ODW(RZx)<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION [35] AND ALTERNATIVE MOTION TO CONTINUE HEARING AND DECISION [36]** |

## I. INTRODUCTION

Throughout Plaintiff Keith Turner's relatively green litigation, the Court has had to blaze a trail through the often-perplexing Real Estate Settlement Procedures Act ("RESPA"), interpreting several unsettled issues. Motion practice has since trimmed this litigation down to one svelte issue: whether Defendant Fidelity National Financial Inc. violated 12 U.S.C. § 2607(a) by receiving kickbacks in exchange for referring overnight-delivery business to Federal Express, UPS, or California Overnight (now "OnTrac").

Now—nearly eight months after he served Fidelity—Turner moves to certify a class of all "persons nationwide who—in connection with a transaction involving a

federally related mortgage loan in which the real estate settlement was handled by a [Fidelity] subsidiary" were charged an overnight-delivery fee during the time when Fidelity had an agreement with FedEx, UPS, or OnTrac. But while Fidelity's potential § 2607(a) liability satisfies Rule 23(a)'s commonality element, class-member-specific questions will inevitably overwhelm any classwide inquiries. The Court therefore **DENIES** Turner's Motion for Class Certification and Alternative Motion to Continue Hearing and Decision.[1] (ECF Nos. 35, 36.)

## II. FACTUAL BACKGROUND[2]

Fidelity is the controlling parent of various escrow subsidiaries. (Compl. ¶ 13.) These escrow subsidiaries use UPS, FedEx, and OnTrac (the "Delivery Companies") to handle overnight deliveries in connection with processing and closing federally related mortgage loans. (*Id.*) The subsidiaries charge escrow customers for these delivery services during closing of real-estate transactions. (*Id.*)

Turner alleges that Fidelity had separate, written "master" agreements with each of the Delivery Companies by which Fidelity—through a subsidiary called EC Purchasing—accepted kickbacks in exchange for referring delivery services to the companies. (*Id.* ¶ 14; Mizes Decl. ¶ 11.) Fidelity characterizes these payments as "marketing" fees from the Delivery Companies, which it receives in relation to the volume of business that Fidelity and its escrow subsidiaries transact with the carriers. (Compl. ¶ 15; Mizes Decl. ¶ 12.) Turner alleges that Fidelity's compliance department has repeatedly instructed its escrow subsidiaries to use the Delivery Companies for overnight delivery services. (Compl. ¶ 17.) But Fidelity contends that it has allowed subsidiaries to use other vendors so long as they had a supporting invoice for the exact amount charged. (Lonza Decl. ¶ 6.)

/ / /

---

[1] After carefully considering the papers filed with respect to this Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7-15.

[2] The Court incorporates the factual backgrounds set forth in its previous Orders by reference. (*See* ECF Nos. 26, 33.)

The contracts between the Delivery Companies and EC Purchasing have not remained constant. The calculation of the marketing fee from FedEx varied from 1999 until the present and was modified at least three times. (May 22, 2014 Mizes Decl. ¶ 13.) There has been similar percentage and shipping-level alteration with respect to UPS and OnTrac. (*Id.* ¶¶ 14–15.) Moreover, between January 1, 2001, and July 18, 2004, there was no marketing fee associated with OnTrac deliveries. (*Id.* ¶ 15.) And from April 19, 2010, until the present, there have been no marketing fees associated with deliveries using a flat escrow rate. (*Id.*)

Since 1999, Fidelity's subsidiaries have used about 15 different escrow software platforms nationwide. (Williams Decl. ¶ 5.) There could be about 120 different variations in the software to meet the needs of the subsidiaries' particular offices across 34 states. (*Id.* ¶¶ 5–6.) There may also be difficulty in identifying which delivery vendor serviced a particular escrow transaction, as employees may have only entered a billing code and not the particular vendor's name. (*Id.* ¶ 12.) It is further possible that Fidelity might not have a certain document, as the most common retention period is five years. (*Id.* Ex. A (indicating that escrow retention periods range from five to 10 years).)

On September 11, 2012, Turner refinanced his house in Los Angeles, California, with a federally related mortgage loan. (*Id.* ¶ 24.) Lawyers Title, another Fidelity subsidiary, handled the escrow. (*Id.*) Lawyers Title's "Final Settlement Statement (HUD-1)" included a charge for overnight deliveries through FedEx and OnTrac.

On September 9, 2013, Turner and former Plaintiff Melissa Henson filed this putative class action against Fidelity, alleging that Fidelity received kickbacks and fee splits in violation of RESPA. (ECF No. 1.) Fidelity subsequently moved to dismiss the Complaint for failure to state a claim. The Court granted in part that Motion, eliminating Henson from the action as well as Turner's claim under 12 U.S.C. § 2607(b).

On April 11, 2014, Fidelity moved for judgment on the pleadings, contending that RESPA exempted Fidelity from any possible liability under 12 U.S.C. § 2607(a) because EC Purchasing performed actual services in exchange for the marketing fees it received from the Delivery Companies. (ECF No. 29.) But the Court denied that Motion, finding that the pleadings raised a genuine issue of fact as to whether the marketing-fee arrangement was just a prohibited quid pro quo scheme by another name. (ECF No. 33.)

On May 16, 2014, Turner moved to certify the following class relating to his sole remaining claim for alleged violation of § 2607(a):

> All persons nationwide who—in connection with a transaction involving a federally related mortgage loan in which the real estate settlement was handled by a subsidiary of Fidelity National Financial (including Fidelity National Title, Chicago Title, Commonwealth Land Title, Alamo Title, Ticor Title, Lawyers Title, and Security Union Title)—were charged a Federal Express, UPS, or California Overnight (OnTrac) fee during the period of time in which Fidelity National Financial had an agreement with Federal Express, UPS, or California Overnight (OnTrac) to receive a fee.

(ECF No. 35.) Alternatively, he moves to continue the class-certification-motion hearing date so that he can conduct further class-related discovery. (ECF No. 36.) Fidelity timely opposed both Motions. (ECF Nos. 37, 38.) Those Motions are now before the Court for decision.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 23(a), a party seeking class certification must initially meet four requirements:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

/ / /

  (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

  (4) the representative parties will fairly and adequately protect the interests of the class.

The proposed class must also satisfy at least one of the three requirements listed in Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011). Here, Turner relies solely on Rule 23(b)(3), which states that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The plaintiff bears the burden of demonstrating that the putative class satisfies each of Rule 23(a)'s elements along with one component of Rule 23(b). *Conn. Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011). In that regard, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 131 S. Ct. at 2551.

A district court must perform a "rigorous analysis" to ensure that the plaintiff has satisfied each of Rule 23(a)'s prerequisites. *Dukes*, 131 S. Ct. at 2551; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011). In many cases, "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Dukes*, 131 S. Ct. at 2551. When resolving such factual disputes in the context of a motion for class certification, district courts must consider "the persuasiveness of the evidence presented." *Ellis*, 657 F.3d at 982 (holding that a district court must judge the persuasiveness and not merely the admissibility of evidence bearing on class certification). Ultimately the

/ / /

decision to certify a class reposes within the district court's discretion. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

## IV. DISCUSSION

After considering the parties' arguments, the Court finds that Turner has failed to established Rule 23(b)(3)'s predominance and superiority elements and that the untimeliness of the Motion provides an independent and alternative basis for denying it.

**A.   Timeliness**

Local Rule 23-3 provides that "[w]ithin 90 days after service of a pleading purporting to commence a class action . . ., the proponent shall file a motion for certification that the action is maintainable as a class action."

Surprisingly, Turner blew past this deadline by almost eight months. He served Fidelity on September 16, 2013, but did not file this Motion until May 16, 2014. (*See* ECF Nos. 5, 35.) He has never requested additional time to file the class-certification motion, and the parties never stipulated to a deadline extension.[3] While Local Rule 23-3 provides a fairly rigid timing requirement, a putative class representative may not simply ignore it. Neither may the Court. In fact, this Court has repeatedly enforced the motion cutoff in other proposed class actions. *See Perez v. Safelite Grp. Inc.*, 553 F. App'x 667, 669 (9th Cir. 2014) ("Perez's challenge to Central District of California Local Rule 23-3 is without merit because the timing of class certification is committed to the discretion of the district judge and Rule 23–3 allows extension of the 90–day certification deadline by order of the court."). Interestingly, Turner also admits that the "Ninth Circuit has repeatedly stated that . . . Local Rule 23-3 (requiring the *filing* of a motion for class certification within 90 days) can properly be enforced by the Central District . . . ." (ECF No. 39, at 1.) The Court therefore finds that Turner filed this Motion late, which provides an independent and alternative ground for denying it.

---

[3] Interestingly, Fidelity fails to address this tardiness issue in its Opposition.

### B. Class-action enforcement of § 2607(a)

Fidelity asks this Court to hold for the first time in American jurisprudence that Congress never authorized class-action enforcement of § 2607(a). Fidelity argues that in drafting RESPA, Congress was not silent on class actions. While § 2605 expressly authorizes class actions to enforce its provisions, Fidelity contends that § 2607 only permits criminal enforcement, individual actions, and suits for injunctive relief by government agencies—not class actions. If Congress intended to permit class actions under § 2607 Fidelity asserts, Congress knew how to do so.

Fidelity correctly recites the statutory-construction canon that where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Miss. ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736, 742 (2014) (internal quotation marks omitted). But Fidelity misapplies that maxim here.

Fidelity misreads how Congress handled class actions in § 2605. Contrary to Fidelity's assertion, Congress did not include § 2605(f) to specifically authorize class actions where they would not otherwise have been available as an enforcement mechanism. Rather, Congress instead provided for statutory damages that are available to class action seeking to enforce § 2605's provisions in addition to the damages an individual would be able to recover in her own action. *See* 12 U.S.C. § 2605(f)(2) (permitting a court to award "any actual damages to each of the borrowers in the class as a result of the failure [to comply with § 2605]" and an additional amount not to exceed $2,000 per class member). Congress apparently included this statutory-damages provision relevant only to class actions to incentivize aggrieved real-estate purchasers to band together to enforce the section's commands.

Moreover, Congress included no words of authorization that would suggest that it thought class actions would not otherwise be a permissible enforcement avenue under RESPA. Section 2605(f)(2) only speaks of damages—not the ability to bring

1  the action itself.  Had Congress sought to specifically empower plaintiffs to bring a
2  class action like Fidelity contends, Congress certainly would have used affirmative
3  language.
4        Section 2605(f)'s legislative history confirms this conclusion.  In the House
5  Conference Report, the Conference Committee noted that "failure to comply with the
6  provisions of this section results in the following liability," and then enumerated
7  damages language similar to the final version of § 2605(f)(2). H.R. Rep. No. 101-943
8  (1990) (Conf. Rep.), *available at* 1990 U.S.C.C.A.N. 6070, 6217.  Nowhere does the
9  Committee indicate that Congress decided to authorize class actions where they would
10 not otherwise have been permitted; they simply state the liability for violating the
11 section.
12       Given these conclusions, Fidelity's argument that Congress meant to preclude
13 class-action enforcement of § 2607 necessarily fails.  Congress's silence with respect
14 to class actions in § 2607 does not indicate that it did not want plaintiffs to be able to
15 bring them; rather, Congress simply decided not to authorize additional statutory
16 damages above the treble damages, costs, and attorneys' fees already awarded.  *See* 12
17 U.S.C. § 2607(d)(2), (5).  Additionally, Congress actually contemplated that multiple
18 plaintiffs might join together to enforce § 2607, as it referenced the "person or
19 persons" who might bring suit.  *Id.* § 2607(d)(2); *see also Shady Grove Orthopedic*
20 *Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010) ("Rule 23 *automatically*
21 applies in all civil actions and proceedings in the United States district courts . . . ."
22 (internal quotation marks omitted)).
23       The Court accordingly finds that a class action is a permissible vehicle to
24 enforce § 2607 and that Fidelity's argument to the contrary fails.
25 **C.    Commonality**
26       The Supreme Court held that Rule 23(a)'s commonality element requires a
27 common contention that is "of such a nature that it is capable of classwide
28 resolution—which means that determination of its truth or falsity will resolve an issue

that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. The focus is not just on raising common questions, "even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotation marks omitted).

Turner argues that all putative class members have suffered the same injury in that Fidelity, via its escrow subsidiaries, has subjected each escrow account to kickbacks, referral fees, or both for real-estate settlement services other than for services actually performed. He points out that all putative class members' claims depend on the common question of whether Fidelity accepted payments from the Delivery Companies in violation of § 2607. Additionally, he contends that all putative class members will recover damages via the same method, i.e., "three times the amount of any charge paid for such settlement service" as provided by § 2607(d)(2).

But Fidelity asserts that Turner only focuses on one common question and does not demonstrate that question's capacity to generate common answers to the ultimate question of § 2607 liability.

Turner has properly established that the question of whether Fidelity violated § 2607(a) by accepting "any fee, kickback, or thing of value pursuant to" the marketing-fee arrangements that its escrow subsidiaries would refer business to the Delivery Companies is common to the putative class. So long as a putative class member obtained a federally related mortgage loan and paid an overnight delivery fee, the legal question that arises is whether Fidelity violated RESPA through a marketing-fee arrangement in place at the time.

This common question is also apt to establish common answers. Each putative class member must establish that Fidelity violated § 2607(a) in order to recover. Therefore, with all putative class members joining together, resolving that issue on a classwide basis will determine an issue relative to each prospective member. The Court thus finds that Turner has established Rule 23(a)'s commonality element.

/ / /

## D. Rule 23(b)(3) requirements

Turner proposes to bring a damages class under Rule 23(b)(3), thus requiring him to establish that common questions predominate over individual ones and that a class action is the superior method of adjudicating this dispute. But the Court finds that he has done neither.

### 1. *Predominance*

The crux of this case is predominance. The Supreme Court has held that Rule 23(b)(3)'s predominance inquiry assesses "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The predominance element is "far more demanding" than Rule 23(a)'s commonality requirement. *Id.* at 624. Rule 23(b)(3) also requires that class-action treatment be the superior method of adjudicating the dispute.

While Turner contends that the issue of whether Fidelity violated § 2607(a) is an overwhelmingly common question, Fidelity vehemently disagrees that this one common inquiry will predominate over individual, class-member-specific issues. First, Fidelity points out that the Court will have to determine whether each putative class member's loan constitutes a "federally related mortgage loan" such that it is within RESPA's ambit. Fidelity points to this Court's previous analysis of RESPA's coverage in *Bergman v. Fidelity National Financial Inc.*, No. 2:12-cv-05994-ODW(RZx) (C.D. Cal. Dec. 3, 2012), in which the Court had to delve into RESPA's several regulatory exemptions to conclude that Bergman's loan was exempted from RESPA coverage.

Fidelity also argues that since Turner has included no temporal limitation on his proposed class, RESPA's one-year statute of limitations for § 2607 violations will plague many putative class members' claims. Fidelity points out that, assuming that the *Bergman* action tolled the statute of limitations, the last day to file a timely claim
///

1 was April 18, 2012. But now Turner proposes a class that dates back to 1999, intending to rely on the discovery rule, equitable tolling, or equitable estoppel.

Third, Fidelity asserts that Turner must show the existence of a referral on a generalized, classwide basis, else class certification should be denied because an individualized inquiry would be necessary to determine if the subsidiaries referred each individual borrower to the Delivery Companies. Fidelity points out that it only issued its internal compliance memoranda in certain states at certain times, so even if they constitute "referrals," not all of them uniformly dated back to 1999. Moreover, OnTrac did not even have a marketing-fee arrangement in place after April 19, 2010, despite having a flat rate included in the 2012 compliance memoranda. Fidelity also argues that the internal compliance memoranda suggest that escrow subsidiaries could use other delivery companies besides FedEx, UPS, and OnTrac, that is, subsidiaries were not "required to use" those delivery vendors. *See* 24 C.F.R. § 3500.14(f).

Fidelity further points out that Turner has not proposed a workable method of overcoming the record-retention issues that will likely plague his proposed class. Fidelity's record-retention policies range from five to 10 years with five years being the most common. Escrow-subsidiary employees also did not always include the name of the delivery company on the HUD-1 settlement statement, which would thus necessitate a complete review of each putative class member's records to determine which delivery vendor serviced the real-estate settlement.

Finally, Fidelity contends that proposed class members that utilized Fidelity National Title Company between May 28, 2006, and September 30, 2012, will be subject to a res judicata or claim-splitting defense since these individuals have already asserted claims for "mark ups" on delivery fees in escrow transactions in *Villanueva v. Fidelity National Title Company*, No. 1-10-CV-173356 (Santa Clara Cnty. Super. Ct. Aug. 8, 2012).

While there is undoubtedly a common, classwide issue of whether Fidelity violated § 2607(a) through its marketing-fee arrangements, the swell of individual

issues necessary to set up each class member's claim will quickly inundate that common inquiry. The Regulations provide that RESPA applies to all federally related mortgage loans except for the exemptions contained in 24 C.F.R. § 3500.5(b). That subsection sets forth seven different exceptions, including a loan on property greater than 25 acres, a loan primarily for business purposes, temporary financing, vacant or unimproved property, subsequent assumptions without lender approval, loans converted to different terms, and secondary-market transactions. 24 C.F.R. § 3500.5(b). As the *Bergman* action demonstrated, within each exemption, there are likely several subissues that one must resolve to determine whether the exemption applies.

For a class member, the Court must analyze two issues: (1) whether the buyer obtained a federally related mortgage loan, and (2) whether a regulatory exemption applies. But these inquiries are not simple on-off switches; rather, they will involve significant record review for each prospective class member's real-estate settlement. *See Bergman v. Fidelity Nat'l Fin., Inc.*, 2:12-CV-05994-ODW, 2012 WL 6013040, at *2 (C.D. Cal. Dec. 3, 2012) ("The determination '[w]hether an investment loan is for a personal or a business purpose requires a case by case analysis' based on the guidelines established in Regulation Z." (quoting *Thorns v. Sundance Props.*, 726 F.2d 1417, 1419 (9th Cir. 1984))).

Turner's contention that "nearly all residential mortgage loans for one- to four-family homes" involve federally related mortgage loans does little to advance his cause. (*See* ECF No. 40, at 10 (emphasis omitted) (quoting Real Estate Settlement Procedures Act (RESPA): Strengthening and Clarifying RESPA's "Required Use" Prohibition Advance Notice of Proposed Rulemaking, 75 Fed. Reg. 31334, 31335 (Jun. 3, 2010)).) The Court does not doubt HUD's hypothesis regarding RESPA's broad application. But that does not obviate the need to determine whether each putative class member's mortgage is federally related in order for that person to be included within the proposed class. The Court cannot simply include people within

the putative class simply because it is likely that their mortgage is federally related; the individual must still prove this point. Turner's argument that "if necessary, each class member can prove this by checking a box on a verified claim form" is chimerical. (*See* ECF No. 40, at 10 n.10; 11 ("At worst, a questionnaire can resolve the issue [of whether RESPA exemptions apply].").) This Court has previously labored to determine whether a loan invoked just one RESPA exemption, so it is difficult to imagine that lay class members will be able to do the same across seven RESPA exemptions simply on the back of a postcard.

Moreover, most proposed class definitions that the Court comes across contain some sort of temporal limitations usually keyed to the applicable statute of limitation. Not here. Turner's putative class sweeps broadly, encompassing all persons who paid an overnight delivery fee in connection with a real-estate settlement covered under RESPA through a Fidelity escrow subsidiary since 1999. The class definition thus includes almost 15 years' worth of potential class members—far more than RESPA's slim one-year statute of limitations for § 2607 violations. *See* 12 U.S.C. § 2614.

Another Central District of California court has previously held that the "individualized, fact-intensive nature" of the statute-of-limitations inquiry "preclude[s] a finding that common issues predominate over individual issues." *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000). That finding persuasively applies here. If the issue were simply whether a class member fell within the one-year limitations period, there would be little difficulty in assessing the viability of each putative class member's claims. But as Turner's Complaint, previous briefing, and the 15-year class period suggest, he seeks to rely upon various exceptions to the statute of limitations, such as the discovery rule, equitable tolling, and equitable estoppel. These doctrines are by their very nature fact-intensive and highly individualized. Putative class member No. 1's diligence in unearthing a potential RESPA violation will bear little on putative class member No. 2's actions.
/ / /

1  With a class that potentially numbers in the tens—if not hundreds—of thousands, the
2  sheer amount of individualized analysis is dizzying.

3  The Court is not persuaded by Fidelity's arguments that it will be difficult and
4  time-consuming to review each putative class member's records to determine which
5  delivery vendor serviced a particular real-estate settlement. Large-scale litigation like
6  this proposed class action is rarely simple.

7  But the record-retention issues present a more compelling problem. For many
8  states, Fidelity's escrow subsidiaries only keep escrow records for five years. As
9  discussed above, Turner wants to envelop some 15 years' worth of escrow transaction
10 into his proposed class. It does not take much imagination to see the very real
11 problem that will plague this litigation if the Court places its imprimatur on such a far-
12 reaching class. For many putative class members, proving RESPA coverage
13 prerequisites might well prove to be highly impracticable if not impossible.

14 So while the Court can readily discern a common question that would govern
15 Turner's proposed class, RESPA prerequisites will quickly swallow the litigation in a
16 sea of class-member-specific inquiries. Lest this litigation be swept away, the Court
17 finds that Turner has not established that common questions will predominate over
18 noncommon ones.

19 *2. Superiority*

20 Rule 23(b)(3) identifies four factors a court should consider in determining
21 whether a class action is the superior method of adjudicating a particular dispute:
22 (A) the class members' interests in individually controlling the
23 prosecution or defense of separate actions;
24 (B) the extent and nature of any litigation concerning the controversy
25 already begun by or against class members;
26 (C) the desirability or undesirability of concentrating the litigation of the
27 claims in the particular forum; and
28 (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The superiority inquiry weighs against class certification when "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually." *Zinser*, 253 F.3d at 1192.

Turner argues that individual real-estate buyers are unlikely to bring separate actions given that they have only suffered damages under $100. But Fidelity points out that § 2607 authorizes treble damages as well as costs and attorneys' fees to the prevailing party. *See* § 2607(d).

Even with treble damages, one lone plaintiff is unlikely to bring suit to recover, as in Turner's case, about $60 in damages. The lawyers get the real pay day with § 2607(d) permitting a court to award the prevailing party its attorneys' fees. Thus, purely going by the damages amount, a class action would be a superior method of adjudicating the putative class members' claims.

But for largely the same reasons as discussed above under the predominance inquiry, there are myriad difficulties that will arise in managing this proposed class action. The most immediate problem will be identifying which real-estate buyers have RESPA-covered loans—complete with a thorny journey through the regulations' seven exemptions. And to even get to that point, a putative class member will have to hope that her escrow company did not dispose of her records once the retention period elapsed. The difficulty in wrangling Turner's proposed class thus weighs heavily against class certification.

**E.    Ascertainability**

A class definition should be "precise, objective, and presently ascertainable," that is, the class must be "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (internal quotation marks omitted). But class treatment is not appropriate if "the court must determine the merits of an individual claim to determine who is a member of the class." *Johns v. Bayer Corp.*, 280 F.R.D. 551, 555 (S.D. Cal. 2012).

1 Since the Court has found that individual issues with respect to whether a putative class member had a federally related mortgage loan predominate, it likewise follows that the proposed class is not ascertainable. Turner specifically circumscribes his putative class to include only persons who were charged an overnight-delivery fee "in connection with a transaction involving a federally related mortgage loan." (Mot. 2.) One would therefore have to determine on an individual basis whether a putative class member's real-estate transaction involved a federally related mortgage loan, including wading through the regulatory-exemptions thicket. Such an intricate, individualized inquiry belies ascertainability.

**F.     Numerosity, typicality, adequacy of representation**

Since the Court finds that Turner has not established several class-certification requirements, the Court cannot certify his proposed class. The Court accordingly need not weigh in on whether he has established numerosity, typicality, or adequacy of representation.

**G.     Motion to continue class-certification hearing**

Turner filed a separate and alternative Motion seeking to continue the hearing on the class-certification Motion in the event that the Court is inclined to deny the Motion for want of evidence. The parties have each argued their respective positions in their briefing. But since the Court is not denying class certification due to any lack of evidence, continuing the class-certification hearing so that Turner can conduct class-related discovery would serve no purpose—especially since his class-certification motion is woefully untimely. Turner's arguments to the contrary are misplaced. The Court therefore **DENIES** that Motion. (ECF No. 36.)

/ / /
/ / /
/ / /
/ / /
/ / /

## V. CONCLUSION

For the reasons discussed above, the Court **DENIES** Turner's Motion for Class Certification and Alternative Motion to Continue Motion and Decision. (ECF Nos. 35, 36.)

**IT IS SO ORDERED.**

June 18, 2014

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**